[Cite as *State v. Miller*, 2025-Ohio-4361.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

STATE OF OHIO,                    :        APPEAL NO.   C-240649
                                           TRIAL NO.    24/CRB/11381
    Plaintiff-Appellee,       :

vs.                              :
                                          *JUDGMENT ENTRY*
RODNEY MILLER,                    :

    Defendant-Appellant.      :


This cause was heard upon the appeal, the record, and the briefs.

For the reasons set forth in the Opinion filed this date, the judgment of the trial court is affirmed.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs be taxed under App.R. 24.

The court further orders that (1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and (2) the mandate b2sent to the trial court for execution under App.R. 27.


**To the clerk:**

**Enter upon the journal of the court on 9/17/2025 per order of the court.**


**By:**_____
      **Administrative Judge**

[Cite as *State v. Miller*, 2025-Ohio-4361.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240649 |
| | | TRIAL NO. 24/CRB/11381 |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| | | *O P I N I O N* |
| RODNEY MILLER, | : | |
| Defendant-Appellant. | : | |

Criminal Appeal From: Hamilton County Municipal Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: September 17, 2025

*Emily Smart Woerner*, City Solicitor, *William T. Horsley*, Chief Prosecuting Attorney, and *Robert S. Hendricks*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Brian A. Smith Law Firm, LLC*, and *Brian A. Smith,* for Defendant-Appellant.

**CROUSE, Presiding Judge.**

**{¶1}** Defendant-appellant Rodney Miller appeals from the trial court's judgment convicting him upon a bench trial of assault, sentencing him to 180 days in jail, and ordering him to pay $1,945.39 in restitution. In two assignments of error, Miller argues that his conviction was against the manifest weight of the evidence and that the trial court abused its discretion in imposing the maximum sentence and ordering him to pay restitution. We find Miller's arguments to be without merit and affirm the trial court's judgment.

## I. Factual and Procedural History

**{¶2}** A complaint was filed in the Hamilton County Municipal Court charging Miller with assaulting A.G. on July 5, 2024.

**{¶3}** At trial, A.G. testified that she was in a relationship with Miller at the time of the offense. A.G. stated that she often stayed with Miller, but that when they "had problems" she would stay with her mother.

**{¶4}** A.G. testified that on the day of the offense, Miller "woke up angry." She stated, "I just remember him becoming violent. I don't remember exactly what started it." When asked if there was a topic that the two had fought about, A.G. responded, "He sometimes accused me of cheating on him." She testified that after she and Miller awoke around 3:00 or 4:00 in the morning, Miller hit her on the side of her stomach with his fist and then struck her legs with a ten-pound kettlebell. Their argument moved from the bedroom into the kitchen, where Miller pushed her down and "slammed [her] so [her] head hit the ground super hard." A.G. identified pictures depicting bruises on her side, leg, and forehead. These pictures were admitted at trial.

**{¶5}** A.G. testified that the entire incident lasted around one hour, and that it ended when she was able to exit Miller's house and call 911. A.G.'s emergency call

3

was admitted and played for the court.

{¶6} A.G. additionally testified that she sought medical attention for her injuries. She was told that she suffered whiplash and was given muscle relaxers.

{¶7} On cross-examination, defense counsel questioned A.G. about her testimony regarding the timing of the assault in the following exchange.

Defense Counsel: Just to clarify, you stated this all occurred around 3:00 to 4:00 in the morning?

A.G.: I believe so.

Defense Counsel: And then you called 9-1-1 around 5:00 p.m.?

A.G.: Well, then I guess it happened later in the day. I can't remember. It happened right before I called the police.

Defense Counsel: Yeah. The 9-1-1 call, we heard you say that it happened in the last 15 minutes. But you didn't call 9-1-1 until 5:00 p.m., correct?

A.G.: Correct.

Defense Counsel: Okay. So if you're saying it happened within the last 15 minutes, you're saying it wasn't 3:00 to 4:00 a.m., it was 4:00 or 5:00 p.m.?

A.G.: It happened that morning and it happened right before I called the police.

Defense Counsel: So it happened twice?

A.G.: No. It happened just one time.

{¶8} Defense counsel attempted to cast doubt on A.G.'s credibility by questioning her about several incidents in which she had allegedly asked Miller for money. First, counsel asked A.G. about a phone call that took place between her and

Miller after the incident occurred. A recording of the telephone call referenced by counsel was played for the court. A.G. identified herself and Miller as the people speaking on the call. During the call, Miller stated, "If I don't give you the money, you're gonna do me like that." A.G. answered affirmatively and referenced Miller sleeping with someone named Tatiana. Miller responded, "So by me f***ing Tatiana, you gonna charge me $3,000 or you're gonna go to court?" A.G. told him to "pay this bill" and "quit talking sh*t." Miller asked, "Or else what?" and AG. told him, "I'm gonna go to court." A.G. then stated that if Miller gave her what she wanted, she would not go to court.

{¶9}     A.G. testified that the purpose of this call was to obtain payment from Miller for her medical expenses.

{¶10}     Defense counsel next asked A.G. if she had ever attempted to prostitute herself to Miller. Specifically, counsel asked A.G. if, after she first met Miller but before they began dating, she had asked him to give her money in exchange for sex. A.G. denied the accusation, explaining that Miller had offered to pay her for sex because she refused to be intimate with anyone with whom she was not in a committed relationship. A.G. acknowledged that Miller helped pay her bills during their relationship.

{¶11}     The trial court asked A.G. several questions about her employment and the timing of her phone call with Miller. A.G. testified that she worked full time for Christ Hospital as a sterile processing tech. She further testified that the phone call with Miller likely took place after she received the bill for her medical treatment, which she estimated was three weeks to one month after the July 5, 2024 incident.

{¶12}     The State also presented testimony from Cincinnati Police Officer Christopher Taylor. Officer Taylor testified that he was dispatched in response to

A.G.'s emergency call, and that upon arriving at the scene, he found an upset A.G. outside near her car. Officer Taylor stated that A.G. showed him her injuries, and that either he or a fellow officer photographed them. He further stated that the pictures were consistent with his observation of the actual injuries on A.G. Officer Taylor testified that A.G.'s emergency call came in at 4:59 p.m. When asked if A.G. had provided a time frame of when this incident occurred, he responded, "So based on what she told us. . . . I put a pretty wide time frame on my report because apparently they had been arguing overnight," and said, "My understanding was the physical part of it happened sometime shortly before we got there."

{¶13} The trial court found Miller guilty of assault, stating,

Having heard all the evidence, there's really only two possible scenarios for what happened.

The first scenario is that [A.G.] was beaten pretty significantly, as the exhibits show, and that Mr. Miller is the person that beat her significantly, as she -- as the State's position here.

The second possible scenario is that [A.G.] was beaten significantly by someone else. Let's call that person Mr. X. In this second scenario, she was beaten significantly by Mr. X and called 9-1-1 shortly after it happened and lied to the 9-1-1 operator and told the 9-1-1 operator that Mr. Miller did it, and not Mr. X.

And then, when police came to her house -- or to the apartment and she lied to the police and told the police that it was Mr. Miller, and that she came to court today and, again, decided to give this Mr. X a free pass and not put any blame on Mr. X, and once again lied about Mr. Miller.

6

That scenario, to me, makes zero sense. It's ridiculous on its face. There's no reason that she would give the guy that actually beat her, Mr. X, a free pass and blame it on a completely innocent person who did nothing to her.

Her testimony, to me, was credible and I believed her testimony. And to me, the fact that there was a discussion about money three to four weeks later doesn't make it any less credible at all. It's not uncommon for people who suffer financial harm to want to be compensated for that harm.

**{¶14}** The trial court then questioned A.G. about restitution and asked her if she had incurred an out-of-pocket loss. A.G. responded, "$1,900." Further questioning clarified that the treatment A.G. had received was billed at approximately $3,600, but that a large portion of that amount was paid by insurance. After the insurance payment, a balance of $1,945.37 remained.

**{¶15}** The trial court sentenced Miller to 180 days in jail and ordered him to pay $1,945.37 in restitution to A.G. The court further stated that it would consider a motion to mitigate the sentence upon payment of the amount of restitution in full. Miller now appeals.

## II. Manifest Weight of the Evidence

**{¶16}** In his first assignment of error, Miller argues that his conviction for assault was against the manifest weight of the evidence.

**{¶17}** A challenge to the manifest weight of the evidence requires this court to "review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice." *State v. Powell*, 2020-Ohio-4283, ¶ 16 (1st Dist.), citing *State*

*v. Thompkins*, 1997-Ohio-52, ¶ 25. Only in exceptional cases where the evidence weighs heavily against the conviction should a new trial be granted. *State v. Bowling*, 2024-Ohio-2881, ¶ 11 (1st Dist.).

**{¶18}** In reviewing the weight of the evidence, if the court finds that the evidence is susceptible to more than one interpretation or construction, we "'must give it the interpretation that is consistent with the judgment.'" *State v. Jordan*, 2022-Ohio-2566, ¶ 58 (1st Dist.), quoting *In re J.C.*, 2019-Ohio-4027, ¶ 20 (1st Dist.).

**{¶19}** Miller was convicted of assault in violation of R.C. 2903.13(A), which provides in relevant part that "[n]o person shall knowingly cause or attempt to cause physical harm to another."

**{¶20}** Miller argues that his conviction was against the manifest weight of the evidence because A.G.'s testimony was not credible. He directs us to A.G.'s testimony regarding the timing of the assault, arguing that her testimony that the incident took place at 3:00 or 4:00 in the morning and that it occurred shortly before she placed an emergency call was both internally inconsistent and implausible because Officer Taylor's testimony established that the emergency call was placed just before 5:00 p.m.

**{¶21}** Miller further argues that A.G. lacked credibility because she had two motivations to falsely accuse him of assault. First, he argues that she had financial motivation to falsely accuse him because he had paid her bills while they were dating. In support of this argument, Miller references the telephone call in which A.G. stated that she would not go to court if Miller paid her $3,000. Second, Miller argues that A.G. was motivated by her jealousy over the fact that he had slept with someone else.

**{¶22}** The trial court was aware of A.G.'s conflicting testimony regarding the timing of the assault. But this was just one portion of A.G.'s testimony. The trial court

also heard A.G. describe her injuries and the locations in which Miller had harmed her, and it was able to compare those descriptions to the pictures of her injuries. Having heard all of A.G.'s testimony, the court found that Miller had committed the assault, as it was entitled to do. A trial court "may believe all, part or none of witness's testimony." *In re J.C.,* 2019-Ohio-4027, at ¶ 20 (1st Dist.). The trial court could have determined that A.G. spoke truthfully about Miller assaulting her but that she was confused on the timing of the incident or as to when she placed the emergency call in relation to the assault.

{¶23} In fact, the trial court explicitly stated that it found A.G.'s testimony to be credible and believable. The court was aware that A.G. had offered to give up pursuit of the criminal charge in exchange for payment from Miller, and it stated that it was not uncommon for someone who had suffered financial harm to want to be compensated for that harm. The law is well-settled that the trial court, as the trier of fact in a bench trial, is in the best position to judge the credibility of the witnesses. *See State v. Shepard,* 2021-Ohio-964, ¶ 62 (1st Dist.); *State v. DeHass,* 10 Ohio St.2d 230 (1967), paragraph one of the syllabus. The trial court reconciled A.G.'s comments and found her to be credible.

{¶24} This was not the rare case in which the trier of fact lost its way and committed a manifest miscarriage of justice in convicting Miller. *See Powell,* 2020-Ohio-4283, at ¶ 16 (1st Dist.). We accordingly hold that Miller's conviction for assault was not against the manifest weight of the evidence and overrule the first assignment of error.

### III. Sentencing

{¶25} In his second assignment of error, Miller argues that the trial court abused its discretion in imposing a maximum sentence of 180 days in jail and in

ordering restitution in the amount of $1,945.37.

**{¶26}** The imposition of a misdemeanor sentence is reviewed for an abuse of discretion. *State v. Yeban*, 2024-Ohio-2545, ¶ 66 (1st Dist.). An abuse of discretion will be found when the trial court's judgment is unreasonable, arbitrary, or unconscionable. *State v. Fields*, 2025-Ohio-2248, ¶ 32 (1st Dist.); *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶27}** When determining an appropriate sentence to impose for a misdemeanor offense, the trial court shall consider the factors set forth in R.C. 2929.22(B)(1). These factors include the circumstances of the offense, whether the offender's history of criminal activity and character reveal a substantial risk that the offender will commit another offense or will be a danger to others, whether certain characteristics of the victim made the victim particularly vulnerable or impacted the seriousness of the offense, whether the offender is likely to commit future crimes, the offender's military service record, and whether the offender has any conditions traceable to the offender's military service that contributed to the commission of the offense. *See* R.C. 2929.22(B)(1)(a)-(g). Where the sentence imposed falls within the available statutory limits, "the trial court is presumed to have considered the required factors, absent a showing to the contrary by the defendant." *Yeban* at ¶ 66.

**{¶28}** Further, a maximum sentence may only be imposed "upon offenders who commit the worst forms of the offense or upon offenders whose conduct and response to prior sanctions for prior offenses demonstrate that the imposition of the longest jail term is necessary to deter the offender from committing a future criminal offense." R.C. 2929.22(C). A trial court is not required to make specific findings on the record before imposing a maximum sentence for a misdemeanor offense. *Yeban* at ¶ 69.

**{¶29}** Miller contends that the trial court abused its discretion in imposing a maximum sentence because the court did not properly weigh the evidence and his conviction was against the manifest weight of the evidence. This argument rehashes Miller's first assignment of error and does not establish an abuse of discretion by the trial court in the imposition of sentence.

**{¶30}** Miller next argues that the trial court erred in considering his criminal history when imposing sentence. He argues that, prior to the instant offense, his last conviction was in 2016, and that this length of time between convictions established that he did not pose a substantial risk of committing another offense. We find no error in the trial court's consideration of Miller's criminal record. While Miller had not incurred any convictions since 2016, his record, as noted by the trial court, was quite lengthy, and it included multiple convictions for offenses of violence.

**{¶31}** Miller additionally argues that the evidence did not support a finding that he committed the worst form of the offense. The evidence presented at trial established that Miller struck A.G. in her side, hit her with a kettlebell, and slammed her head on the ground. We find no abuse of discretion in a determination that this conduct constituted the worst form of the offense.

**{¶32}** Miller additionally argues that the trial court abused its discretion in ordering him to pay $1,945.37 in restitution. He does not challenge the specific amount of restitution imposed. Rather, he contends that because A.G. lacked credibility, the restitution did not bear a reasonable relationship to the actual loss suffered. We have already considered and rejected Miller's arguments concerning A.G.'s credibility. As to whether the amount of restitution bore a reasonable relationship to the loss suffered, A.G. testified that after insurance paid a portion of her medical bills stemming from the assault, she was responsible for $1,945.37.

**{¶33}** We find no abuse of discretion in the trial court's imposition of a maximum sentence and $1,945.37 in restitution. Miller's second assignment of error is overruled, and the judgment of the trial court is affirmed.

Judgment affirmed.

**BOCK** and **MOORE, JJ.,** concur.